WILEY ET AL. v. WILEY ET AL.

[No. 9,924.   Filed May 13, 1919.   Rehearing denied June 27, 1919.
Transfer denied April 29, 1921.]

1. MARRIAGE.—*Validity.*—*Collateral Attack.*—A void marriage is good for no legal purpose and its invalidity may be shown in any court between any parties, either in the lifetime of the ostensible husband and wife or after the death of either or both of them.   p. 465.

2. MARRIAGE.—*Insane Persons.*—*Validity.*—*Common Law.*—Under the common law the ceremonial marriage of an insane person is void.   p. 466.

3. MARRIAGE.—*Control by Legislature.*—The relations, duties, obligations and consequences flowing from the marriage contract are so important to the peace and welfare of society that the legislature may prescribe who may marry, the age at which they may marry, the duties and obligations created by marriage, the procedure and form essential to constitute marriage, the effect on the property rights of the parties, and the causes which shall be regarded as sufficient for its dissolution.   p. 466.

4. STATUTES.—*Construction.*—*"Void."*—In view of the inaccurate use of the word "void" in numerous statutes and decisions, in the sense of "voidable," resort must be had in each instance, in determining the legislative intent in using the word "void," to the context and the nature of the subject-matter involved. p. 467.

5. MARRIAGE.—*Nature of Contract.*—*Statute.*—The marriage contract is unlike any other contract, except as to the element of consent, it being much more than a contract with respect to property, and, though marriage is declared to be a civil contract by §8357 Burns 1914, §5324 R. S. 1881, the evident purpose of the statute is to place the subject of marriage under the control of the civil authorities to the exclusion of the ecclesiastical.   p. 467.

6. MARRIAGE.—*Requisites.*—*Mutual Consent.*—*Marriage by Insane Person.*—*Validity.*—The law requires that the parties must mutually consent to the marriage contract, and, where one of the parties is insane, there can be no marriage, since there can be no mutual consent.   p. 468.

7. MARRIAGE. — *Insane Persons.* — *Validity.* — *Statute.* — Under §8360 Burns 1914, §5325 R. S. 1881, declaring a marriage void when either party is insane, a ceremonial marriage of an insane person is not voidable, but absolutely void.   p. 469.

8. MARRIAGE.—*Annulment.*—*Inherent Powers of Courts.*—*Statutes.*—To the extent that §1060 Burns 1914, §1025 R. S. 1881, providing that a marriage may be declared void when either party is incapable from want of understanding, relates to the matter of adjudging a marriage void, it is purely remedial, and is not intended to prevent the courts from granting relief from the consequences of void marriages in whatever form and between whatever parties the matter may be presented; nor does such statute confer power upon the courts, since courts of equity jurisdiction have inherent power, independent of any statute, to adjudge marriages void which in truth are void. p. 470.

9. MARRIAGES.—*Annulment.*—*Insanity.*—*Statute.*—Section 1060 Burns 1914, §1025 R. S. 1881, providing that when either party to a marriage shall be incapable from want of age or understanding of contracting such marriage, it may be declared void on the application of the incapable party, is inadequate to give a remedy to an incapable party whose incapacity is due to insanity, even though so intended by the legislature, since where one of the parties to a marriage ceremony is insane, he cannot, while in that mental condition institute an action in his own behalf to declare the marriage void, and the legislature has not authorized anyone, not even his guardian, to institute such an action for him. p. 471.

10. STATUTES.—*Construction.*—*Conflicting Statutes.*—Where two statutes are apparently conflicting or inconsistent, it is the duty of the court to construe them so that both, if possible, may stand. p. 472.

11. STATUTES.—*Amendment by Implication.*—*Constitutional Provisions.*—Under §21 Art. 4 of the Constitution of Indiana a statute may not be amended by implication. p. 472.

12. MARRIAGE.—*Validity.*—*Insane Persons.*—*"Want of Age or Understanding".*—*Statutes.*—*Construction.*—The legislature did did not intend, by enacting §1060 Burns 1914, §1025 R. S. 1881, providing that when either party to a marriage shall be incapable, from want of age or understanding, of contracting such marriage, it may be declared void on the application of the incapable party, to repeal §8360 Burns 1914, §5325 R. S. 1881, declaring that a marriage shall be void when either party is insane or idiotic at the time of such marriage, the words "want of age or understanding," as used in the former section, not referring to the insanity which is declared by the latter section to make the marriage void. (Teter v. Teter [1883], 88 Ind. 494, and Burns v. Cope [1914], 182 Ind. 289, criticised.) p. 472.

13. MARRIAGE. — *Insane Persons.*—*Validity.*—*Ratification.*—*Presumption.*—A marriage which is void by reason of the insanity of one of the parties cannot be ratified, but should such party be restored to sanity and thereafter the contracting parties live together as husband and wife for a long period of time, under circumstances evincing pure motives and good faith from the beginning, the presumption may arise that the parties actually entered into a new marriage, though such presumption, being one of fact, may be rebutted; and while such new marriage may in a proper case be valid at common law there is a distinction between a common-law marriage and ratification. p. 474.

14. MARRIAGE.—*Annulment.*—*Relief.*—In an action to declare a marriage void, the real purpose of which is to determine property rights, it is proper that the status of a child, born during the time the parties lived together as husband and wife, but alleged not to have been begotten by the husband, be determined, so that all conflicting claims may be settled without other litigation. p. 475.

From Decatur Circuit Court; *John W. Donaker,* Judge.

Action by Mack H. Wiley and others against Emma Bagby Wiley and others. From a judgment in favor of part of the defendants, plaintiffs and other defendants appeal. *Reversed.*

*Elmer Bassett,* for appellants.

*Thomas E. Davidson, Goddard & Craig, Wickens, Osborn & Hamilton* and *Tremain & Turner,* for appellees.

This action was instituted by appellant Mack H. Wiley against appellee Emma Bagby Wiley and twenty-eight others. The complaint as filed consisted of two paragraphs, but the second paragraph was dismissed, and throughout the opinion we will refer to said first paragraph as "the complaint."

The following facts are averred in the complaint:

"One Hugh F. Wiley died intestate at the county of Decatur on the 19th day of January, 1916. He left an estate consisting of real property of the value of

$15,000.00 (particularly described) and personal property of the value of $1,000.00. He left surviving a sister, two brothers, eight nieces, six nephews, and four grand-nieces. Said surviving relatives are the deceased's sole heirs-at-law and inherited his entire estate by virtue of the laws of Indiana, if the marriage assailed in this action is void. After the death of said Hugh F. Wiley his sister conveyed to the appellant Mack H. Wiley the portion of the real estate which she claims to have inherited from the deceased, being an undivided one-seventh, and that he is now the owner thereof. The personal property is sufficient to pay all claims against the estate and costs of administration.

"On May 11, 1911, the said Hugh F. Wiley was adjudged to be an insane person, by a duly constituted legal tribunal, and was committed by said tribunal to the Southeastern Hospital for the Insane at Madison, Indiana, in which institution he was confined for two months. At no time after his confinement in said hospital was said Hugh F. Wiley, by any court or by any proceeding known to the law, adjudged to be a person of sound mind; and from the time of his said commitment continuously to the time of his death he was an insane person.

"On April 19, 1915, a pretended marriage was solemnized between the said Hugh F. Wiley and one Emma Bagby, who is here designated by the name Emma Bagby Wiley. From the date of said pretended marriage until May 11, 1915, the said Hugh F. Wiley and Emma Bagby Wiley lived together as husband and wife, but did not so live together at any time thereafter. At the time of said pretended marriage Hugh F. Wiley was 71 years of age and his mind and memory were so impaired that he was wholly incapable of entering into a contract of marriage. At the time of the marriage he was the owner of the property aforesaid.

"At the time of said pretended marriage, and for more than 2 months prior thereto, and continuously thereafter until his death, the said Hugh F. Wiley was an insane person and had not sufficient mental capacity during any of said time to understand the nature and obligations of the marriage contract, and during all of said time was incapable from want of understanding of contracting marriage; and continuously after said pretended marriage he was incapable, because of his want of understanding, of ratifying said pretended marriage. The said Emma Bagby Wiley at the time of the said pretended marriage and for some days prior thereto, knew that said Hugh F. Wiley was an insane person and incapable of entering into a marriage contract.

"At the time of said pretended marriage the said Emma Bagby Wiley was a woman of bad moral character, lewd and unchaste; and was the mother of a bastard child 3 years of age.

"The first meeting and the first acquaintance of said Emma Bagby Wiley and said Hugh F. Wiley was on the afternoon of April 15, 1915, and not prior thereto. At the time of said meeting and at the time of said pretended marriage the said Emma Bagby Wiley was enciente; and on December 20, 1915, she was delivered of a fully developed nine-months child who is now living and whose name is Ethel Pauline Wiley. The said Ethel Pauline Wiley was not begotten by the said Hugh F. Wiley and is not his child. The said Ethel Pauline Wiley was begotten by another man before the said Emma Bagby Wiley ever saw or met the said Hugh F. Wiley. At the time of said pretended marriage and prior thereto the said Hugh F. Wiley did not know, nor did he have mind enough to realize, that said Emma Bagby Wiley was pregnant; and that the said Emma Bagby Wiley then and there well knew of her physical condition and knew that she was pregnant on April 15,

1915. Said Hugh F. Wiley at no time ever acknowledged said Ethel Pauline Wiley as his child.

"Said pretended marriage was brought about and caused to be consummated through and by reason of a conspiracy entered into, planned, schemed and formed by the said Emma Bagby Wiley, Dr. Cecil G. Harrod, Herman Borcher and others unknown to this plaintiff, all of whom were well aware of the irresponsible mental condition of the said Hugh F. Wiley, with the fraudulent intent, purpose and motive to acquire the property and estate of the said Hugh F. Wiley; and for the further fraudulent purpose, object and intent of overreaching the said Hugh F. Wiley into acknowledging, when born, the then unborn illegitimate child with which the said Emma Bagby Wiley was then pregnant. The said Hugh F. Wiley at that time was insane and was induced and influenced to enter into said pretended marriage by the concerted action and connivance, the particulars of which are not known to this plaintiff, of said conspirators, for the fraudulent and unlawful purpose of cheating and defrauding said Hugh F. Wiley out of his property, and for the fraudulent and unlawful purpose of cheating and defrauding the natural and legal heirs of said Hugh F. Wiley out of any property of which he might die the owner, and for the fraudulent and unlawful purpose of securing for themselves the property of said Hugh F. Wiley which he owned and of which he might die seized. Said Herman Borcher was and is a man of bad moral character and of long acquaintance with the said Emma Bagby Wiley, and for many months prior to said pretended marriage he was intimately acquainted with both the said Emma Bagby Wiley and the said Dr. Cecil G. Harrod.

"On April 17, 1915, said Emma Bagby Wiley and her co-conspirators induced said Hugh F. Wiley to accompany her to the office of the clerk of the Decatur circuit

court where application was made for a marriage license. The clerk refused to issue a license; for the reason that a proceeding was then pending in said court for the purpose of having said Hugh F. Wiley adjudged a person of unsound mind. Thereupon said application was taken to the judge of said court who sustained the action of the clerk and ordered that no license be issued. On April 19, 1915, said Hugh F. Wiley was taken by said Emma Bagby Wiley and her said confederates to Jeffersonville, Indiana, or to Louisville, Kentucky, the exact place being unknown to the plaintiff, where a marriage license was obtained and a marriage ceremony performed.

"At the June, 1915, term of the Decatur circuit court said Emma Bagby Wiley was indicted for perjury arising out of alleged false answers made by her in her application for a license to marry said Hugh F. Wiley. On September 27, 1915, one Ed. B. Bach, by his affidavit filed with a justice of the peace, charged her with the crime of perjury, arising out of her testimony given before the grand jury. She was put under bond in the sum of $1,000.00 by the justice of the peace to appear at the next term of the Decatur circuit court. On January 17, 1916, the prosecuting attorney of said county filed his affidavit charging her with the crime of perjury, arising out of her testimony before the grand jury.

"On May 8, 1915, said Hugh F. Wiley, by proper legal proceedings duly instituted, was adjudged an insane person and re-committed to the State Hospital for Insane, and was received at said Hospital May 11, 1915. He was thereafter continuously confined in said institution until his death.

"On the —— day of June, 1915, said Ed. B. Bach was duly appointed guardian of the person and estate of said Hugh F. Wiley, by the Decatur circuit court. On June 30, 1915, an action was commenced in said

court, entitled Hugh F. Wiley v. Emma Bagby Wiley, to annul said pretended marriage on the ground of the mental incapacity of said Hugh F. Wiley at the time of said marriage. Said Bach, as guardian aforesaid, maintained, continued, and prosecuted said action until long after the death of his said ward.

"After the death of said Hugh F. Wiley said Ed. B. Bach, as guardian aforesaid, entered into an agreement with said Emma Bagby Wiley and others, which agreement is said to have been reduced to writing. Plaintiff avers that, as he is informed and believes, said agreement contains stipulations whereby said Emma Bagby Wiley and said Ethel Pauline Wiley together are to receive four-sevenths of said estate; that one Mollie K. Henderson is to receive three-sevenths of said estate; that said Ed. B. Bach and one Rollin A. Turner are to be appointed administrators of said estate; and that the suit to annul said marriage and the criminal proceedings aforesaid are to be dismissed. Pursuant to said agreement all said causes pending in said court were dismissed; said Bach and Turner, the latter being an attorney for Emma Bagby Wiley, were appointed administrators of the estate of the said Hugh F. Wiley, deceased; and said administrators are proceeding with the settlement of said estate. None of appellants was a party to said agreement nor a party to any of the proceedings, suits or actions aforesaid. None of the appellants has in any manner consented to or ratified said agreement or any of the proceedings with reference to said actions pending in said circuit court.

"Mollie K. Henderson, as plaintiff is informed, is claiming some relationship to the deceased which will entitle her to share in his said estate; and she is made a party to answer as to such relationship and as to her interest, if any, in said estate.

"Ed. B. Bach and Rollin A. Turner, as administra-

tors, are made defendants to answer as to any interest they may have in their trust capacity or otherwise.

"Plaintiff avers that said pretended marriage was void and of no effect from the beginning; that said Ethel Pauline Wiley was not begotten by, and is not the child of, the said Hugh F. Wiley; and that she is the child of another man; that the descent and distribution of the property in the estate of said decedent depends on a judicial determination of the validity or invalidity of said pretended marriage, and of the legitimacy or illegitimacy of said Ethel Pauline Wiley.

"Prayer that said marriage be declared void; that the legitimacy of Ethel Pauline Wiley be determined and that she be adjudged not to be the child of said Hugh F. Wiley; and for such further order in the premises as the court may deem just, equitable and right."

The appellants, other than Mack H. Wiley, joined in a cross-complaint against the appellees. The substance of the cross-complaint is identical with that of the complaint. Appellees demurred to the complaint on the ground that it does not state facts sufficient to constitute a cause of action, and also demurred to the cross-complaint on the same ground. Each demurrer was sustained. Appellants refused to plead further, and judgment was rendered accordingly. The ruling on each demurrer is assigned as error.

Dausman, C. J.—As frequently occurs in equity cases, the complaint covers a variety of elements which tend to a common purpose. The specific relief asked is (1) that the ostensible marriage be adjudged void, and (2) that the status of the child be judicially established. But it is clear that the ultimate purpose of the action is to determine the property rights of the parties. In other words, the ultimate purpose of the action is to determine who are the heirs at law and entitled to take the estate of the deceased. Under the facts averred,

if the ostensible marriage is void, then Emma Bagby Wiley has no interest in said estate; and if Ethel Pauline Wiley is not the child of the deceased, then she has no interest in the estate. The purpose of the action is as unmistakable as if appellants had filed a complaint to quiet title to the real estate under §1116 Burns 1914, §1070 R. S. 1881, or to make proof of heirship or title under §2928 Burns 1914, §2406 R. S. 1881.

Appellants are not seeking to dissolve a voidable marriage. They rest their claim to the estate on the unequivocal theory that the pretended marriage is

1.   void. They are concerned in the marital status of their ancestor to the extent only that it interferes with their alleged title to his estate. If appellants had joined in a complaint to quiet title, in the usual short form under the statute, and containing no reference whatsoever to the pretended marriage, nevertheless, under the general rule, the marriage could have been thus attacked collaterally; and, if shown to be void, could have been so declared in that proceeding. In other words under the general rule, if the ostensible marriage is void, then the appellants would not be compelled to bring an action for the specific purpose of having it so adjudged; for a void marriage is good for no legal purpose, and its invalidity may be shown in any court, between any parties, either in the lifetime of the ostensible husband and wife or after the death of either or both of them. *Halbrook* v. *State* (1879), 34 Ark. 511, 36 Am. Rep. 17; *In re Gregorson's Estate* (1911), 160 Cal. 21, 116 Pac. 60, L. R. A. 1916C 697, Ann. Cas. 1912D 1124; *Cartwright* v. *McGowan* (1887), 121 Ill. 388, 12 N. E. 737, 2 Am. St. 105; *Orchardson* v. *Cofield* (1897), 171 Ill. 14, 49 N. E. 197, 40 L. R. A. 256, 63 Am. St. 211; *Jenkins* v. *Jenkins* (1834), 2 Dana (Ky.) 102, 26 Am. Dec. 437; *Powell* v. *Powell*

(1877), 18 Kan. 371, 26 Am. Rep. 774; *Gathings* v. *Williams* (1845), 27 N. C. 487, 44 Am. Dec. 447; *Crump* v. *Morgan* (1843), 38 N. C. 91, 40 Am. Dec. 447; *Sims* v. *Sims* (1897), 121 N. C. 297, 28 S. E. 407, 40 L. R. A. 737, 61 Am. St. 665; *Foster* v. *Means* (1844), Speers Eq. (S. C.) 569, 42 Am. Dec. 332; *Fearnow* v. *Jones* (1912), 34 Okla. 694, 126 Pac. 1015, L. R. A. 1916C 720; *Mountholly* v. *Andover* (1839), 11 Vt. 226, 34 Am. Dec. 685; 18 R. C. L. 439 *et seq.*

By the common law of England, as it has existed there for centuries, the ceremonial marriage of an insane person is void; and under that law (excluding all statutory influences) it has been the duty of every court to which, and in every form in which, the subject could be presented, to pronounce such marriage void. *Crump* v. *Morgan, supra; Jenkins* v. *Jenkins, supra; Jaques* v. *Public Administrator* (1851), 1 Bradford (N. Y.) 499; *Atkinson* v. *Medford* (1859), 46 Me. 510; 4 Kent's Comm. 76; Blackstone's Comm. subject, "Husband and wife." That law our ancestors brought with them to this country. It was made the law of the territory of Indiana as early as 1795 by the Governor and Judges, acting under the authority of the ordinance of 1787. It was adopted by the territorial legislature in 1807; and by legislative declaration it has continuously remained the law of this state, except wherein it is incompatible with enactments of the general assembly or constitutional provisions. §236 Burns 1914, §236 R. S. 1881; *Stevenson* v. *Cloud* (1839), 5 Blackf. 92; *Sopher* v. *State* (1907), 169 Ind. 177, 81 N. E. 913, 14 L. R. A. (N. S.) 172, 14 Ann. Cas. 27.

But the relations, duties, obligations and consequences flowing from the marriage contract are so important to the peace and welfare of society as to be subject to legislative control. The legislature may prescribe who may marry; the age at which they

may marry; the procedure and form essential to constitute marriage; the duties and obligations created by marriage; the effect on the property rights of the parties; and the causes which shall be regarded as sufficient for its dissolution.   18 R. C. L. 386 *et seq.;* 9 R. C. L. 245.

In 1852 the legislature enacted the following statute:

The following marriages are declared void:   "First. When either party had a wife or husband living at the time of such marriage.   Second.   When one of the parties is a white person and the other possessed of one-eighth or more of negro blood.   Third.   When either party is insane or idiotic at the time of such marriage." §8360 Burns 1914, §5325 R. S. 1881.

The presumption is that by the word "void" the legislature intended precisely what the word connotes; and we would hold unhesitatingly that clause three of said section is merely declaratory of the common law, were it not for the familiar fact that the word "void" is commonly misused.   The carelessness of legislators, judges and lawyers, in using the word "void," is deplorable and inexcusable.   29 Am. & Eng. Ency. 1065; 40 Cyc 214; *Bennett* v. *Mattingly* (1887), 110 Ind. 197, 202, 10 N. E. 299, 11 N. E. 792; *Irwin* v. *Marquett* (1901), 26 Ind. App. 383, 59 N. E. 38, 84 Am. St. 297. In determining the legislative intent nothing is to be gained by comparing the numerous statutes and decisions in which the word "void" is inaccurately used in the sense of "voidable"; for in each instance the real meaning must be determined from the context and the nature of the subject-matter involved.   Nor can we derive any assistance by considering how the word is used in the law of negotiable instruments, conveyances, and contracts generally; for it is clear that the marriage contract is unlike any other contract, except as to the element of consent.   It is much

more than a contract with respect to property.    18 R.
C. L. 383 *et seq.; Noel* v. *Ewing* (1857), 9 Ind. 37; *Mc-
Cabe* v. *Berge* (1883), 89 Ind. 225; *Pence* v. *Aughe*
(1885), 101 Ind. 317; *Castor* v. *Davis* (1889), 120 Ind.
231, 22 N. E. 110.    True, the legislature has declared
marriage to be a civil contract.    §8357 Burns 1914,
§5324 R. S. 1881.    But the evident purpose of that dec-
laration is to place the subject of marriages under the
control of the civil authorities to the exclusion of the
ecclesiastical, and to prevent its degradation by being
subjected to the mandates, dogmas or vagaries of any
particular sect or cult.    *Michigan University* v. *Mc-
Guckin* (1901), 62 Neb. 489, 87 N. W. 180, 57 L. R. A.
917; *Grigsby* v. *Reib* (1913), 105 Tex. 597, 153 S. W.
1124, L. R. A. 1915E 1, Ann. Cas. 1915C 1011.    Note:
L. R. A. 1915E 15.

An ethical marriage is pre-eminently psychical.    It
is the union of two lives in mutual esteem, confidence
and love.    "While it is in some degree of the
head, it is primarily and chiefly of the heart;"
and the ceremonial solemnization in accordance
with the requirements of the state is "the legal band
around affections assumed to be already united."
Bishop, M. D. & S. §599; Herbert Spencer, Ethics of
Individual Life; *Orchardson* v. *Cofield, supra.*    There
may be a lawful marriage where the ethical element is
lacking, but the very least that the law will tolerate is
mutual consent.    Where one of the parties is insane
there can be no mutual consent, and therefore no mar-
riage; and in such cases it would be shameful to hold
that any sort of ceremony can create the relation of
husband and wife.    From the thought of it, reason and
conscience revolt.

When we reflect upon the nature of marriage and
contemplate its importance in the development of the

race, we realize the necessity of cherishing so precious an institution and of maintaining its essential characteristics. It is the foundation of the home and the origin of those family ties, without which we would cease to be human. It is the source of those motives which prompt us to provide care and comfort for childhood and old age, and to plan and toil and sacrifice for the welfare of future generations. Throughout the ages it has fostered the development of those qualities of head and heart which give us all there is of worth in life. *Bishop* v. *Brittain Inv. Co.* (1910), 229 Mo. 699, 129 S. W. 668, Ann. Cas. 1912A 868. We cannot believe, therefore, that the general assembly intended by §8360 *supra,* to provide a way whereby marriage may be polluted; but we are of the opinion that it intended thereby to protect it against just such wickedness as is averred in the complaint. By declaring the ceremonial marriage of an insane person void, the law frustrates the unscrupulous by blasting the hope of pecuniary gain. See *Huffman* v. *Huffman* (1912), 51 Ind. App. 330, 99 N. E. 769.

In view of all the legislation on this subject, we have no doubt that it is the purpose and policy of the legislature to protect the citizens of the state from 7. the evil consequences which would inevitably result from the marriage of the insane. The legislative effort to afford this protection would be nullified by holding such marriages voidable. See §8363 *et seq.* Burns 1914, Acts 1905 p. 215. We are of the opinion that the word "void" in said §8360 *supra,* is accurately used, and that under the facts averred in the complaint the ceremonial marriage of Hugh F. Wiley and Emma Bagby is void.

But counsel insist that §1060 Burns 1914, §1025 R. S. 1881, supports their contention that the legislature

intended that the marriage of an insane person should be not void, but voidable. Section 1060 *supra,* is in the following language:

"When either of the parties to a marriage shall be incapable, from want of age or understanding, of contracting such marriage, the same may be declared void, on application of the incapable party, by any court having jurisdiction to decree divorces; but the children of such marriage, begotten before the same is annulled, shall be legitimate; and in such cases the same proceedings shall be had as provided in applications for divorce."

This section is §25 of an act entitled: "An Act regulating the granting of divorces, nullification of marriages, and decrees and orders of courts incident thereto, and repealing all laws conflicting with this act, and declaring an emergency." Acts 1873 p. 107.

The real question presented by this contention is whether the legislature intended that the words "want of * * * understanding," in §1060, *supra,* should be taken as the equivalent of "insane or idiotic," in §8360, *supra.*

It is clear that, to the extent that it relates to the matter of adjudging a marriage void, §1060 *supra,* is purely remedial. As to that feature there is nothing to be said in its favor, if it be applicable to a marriage where one of the parties is insane. It confers no power upon the courts; for it is universally conceded that courts of equity jurisdiction have inherent power, independent of any statute, to adjudge marriages void which in truth are void. *Henneger* v. *Lomas* (1896), 145 Ind. 287, 299, 44 N. E. 462, 32 L. R. A. 848, and authorities there cited. It is a wise provision of the law which has clothed the courts with this inherent power; for, while it is not essential that such a judgment must be rendered in order that the pre-

sumed consequences of an ostensible marriage may be avoided, nevertheless such a judgment serves a beneficent purpose, which cannot be so effectively accomplished in any other way. Such a judgment, when rendered in an action between the parties to an ostensible marriage, constitutes an unassailable record which fixes the true status of the parties, overthrows the presumptive rights which arise from and are dependent upon the supposed marriage, and affords security to all persons who may have business or social relations with the ostensible husband and wife. To permit this inherent judicial power to be curtailed or narrowed, would be a public misfortune. We are of the opinion that this statute was not intended to prevent the courts from granting relief from the presumptive consequences of void marriages, in whatever form and between whatever parties the matter may be presented.

If the legislature intended by §1060, *supra,* to give a remedy to an incapable party whose incapacity is due to insanity, then manifestly it is inadequate for the purpose intended. Where one of the parties is insane, such insane party cannot, of course, while insane institute an action in his own behalf to declare the marriage void; and the legislature has not authorized any one—not even his guardian—to institute such an action for him. *Pence* v. *Aughe, supra.* To make the remedy in any event available to the insane person, we would be obliged to read into said section the provision that the insane person may avail himself of the remedy *on being restored to sanity.* On that basis, if the insane person never should be restored to sanity he would remain married until death, and everybody concerned, and also the state, would be bound by the marriage. Such a rule can rest on nothing other than the conception of a voidable marriage. Such a rule would be so far beneath the established standard of

decency, so abhorrent to the prevailing moral sense, and so incompatible with the public welfare, as to be intolerable in a civilized commonwealth.    Such a rule would permit an unscrupulous adventuress or adventurer to acquire property by a method involving turpitude to a greater degree than forgery or burglary, to say nothing of the deplorable consequences likely to be entailed upon the children of the insane.    Furthermore, to put that construction on §1060, *supra,* would be unwarranted, for the reason that by implication it would deprive the sane party, however innocent and honest, of any remedy whatsoever.    See *Huffman* v. *Huffman, supra.*    Also, it would bring this section into direct conflict with §8360, *supra.*

It is our duty to construe the two sections now under consideration so that, if possible, both may stand.    For obvious reasons we cannot entertain the thought 10-12.  that the legislature intended by enacting §1060, *supra,* to repeal §8360, *supra.*    We dare not say that the former amends the latter, for a statute may not be amended by implication.    §21, Art. 4, Constitution of Indiana.    The title of the act of 1873 excludes every conclusion other than the one we have reached, if §1060, *supra,* is to be regarded as constitutional.    We are of the opinion, therefore, that by the words "want of age or understanding" the legislature had reference to something other than the insanity which is declared to make the marriage void.

Our attention has been directed to certain cases which apparently conflict with our decision in the case at bar, and it is advisable that we give them some consideration.

In *Teter* v. *Teter* (1883), 88 Ind. 494, it is stated, in effect, that a ceremonial marriage, where the man has a wife then living, is void, but that a ceremonial marriage where one of the parties is insane is voidable.

But the question whether the ceremonial marriage of an insane person is void or voidable was not before the court, and the statement concerning that question is pure dictum. A reading of the case of *Koonce* v. *Wallace* (1859), 52 N. C. 194 (7 Jones 194), discloses that the statement therein made concerning the same question, is also pure dictum. We have, then, a case of dictum resting on dictum. Furthermore, in *Koonce* v. *Wallace, supra,* the court referred to a marriage into which one of the parties was incapable of entering by reason of "a mere want of age or understanding." The dictum in *Teter* v. *Teter, supra,* therefore, must be regarded as one of those side remarks which are so apt to fall lightly and unobserved when the mind is intent on the main question. Had the question been briefed and argued, and presented to the court as the real question for decision, we are forced to assume that the statement would not have been made. Section 8360, *supra,* declares void three kinds of marriages. The word "void" is used but once in that section. While the legislature sometimes has used "void" in the sense of "voidable," it is incredible that it would attempt to use the word in both senses at the same time in the same sentence.

In *Bruns* v. *Cope* (1914), 182 Ind. 289, 105 N. E. 471, it is stated, contrary to the general rule, that the marriage status cannot be questioned in a statutory action; and this holding is apparently on the ground that the question of the validity of a presumptive marriage never should be submitted to a jury. Concerning the opinion in the Bruns case we deem it our duty to say, most respectfully, that it confounds the element of insanity with the element of fraud. In other words, it indicates that the law regards a ceremonial marriage where one of the parties is insane as being exactly on the same footing as a marriage into which one of the parties is

induced by fraud. Evidently the legislature was of the opinion that, in the very nature of things, the one differs radically from the other; for it has declared void the one, but not the other. §8360, *supra*. We must keep constantly in mind that we are bound by this statute. Furthermore, with respect to the point now under consideration, the Bruns case seems to conflict with prior decisions by the same court, which prior decisions are therein cited and approved. *Teter* v. *Teter* (1885), 101 Ind. 129, 51 Am. Rep. 742; *Boulden* v. *McIntire* (1889), 119 Ind. 574, 21 N. E. 445, 12 Am. St. 453; *Wenning* v. *Teeple* (1896), 144 Ind. 189, 41 N. E. 600. (See also *Teter* v. *Teter* [1883], 88 Ind. 494; *Franklin* v. *Lee* [1901], 30 Ind. App. 31, 62 N. E. 78.) However, the Bruns case does not conflict in the slightest degree with our view of the case at bar, for this action is in the form suggested by that case.

On account of certain averments in the complaint we deem it proper to say that a void marriage cannot be ratified. The ratification of nothing is unthinkable and impossible. *Teter* v. *Teter*, 88 Ind. 494, *supra*. Should the insane party be restored to sanity, and thereafter the two should live together as husband and wife for a long period of time, under circumstances evincing pure motives and good faith from the beginning, then from their subsequent and continued conduct the presumption may arise that the parties actually entered into a new marriage, which new marriage, although there was no solemnization and no compliance with any of the provisions of the statute relating to the procurement of a license, nevertheless in some cases may be valid at common law. *Teter* v. *Teter*, 101 Ind. 129, *supra*; *Franklin* v. *Lee*, *supra*. The distinction between such a marriage, commonly called a common-law marriage, and ratification, is real and substantial. The presumption of marriage arising out

of the conduct of the parties, is one of fact. It is therefore rebuttable, and reliance upon it is hazardous.

In order that there may be no misunderstanding we desire to emphasize the fact that in arriving at the conclusion that the ceremonial marriage of Hugh F. Wiley and Emma Bagby is void under the averments of the complaint, we have excluded from consideration the allegations concerning fraud and conspiracy, and we hold said marriage void solely on the ground of his alleged insanity. But this statement must not be taken as an intimation that the manner in which the marriage was brought about may not be proved at the trial for whatever bearing it may have on the main issue.

However, it is entirely proper that the status of the child Ethel Pauline should be determined in this action, so that all conflicting claims to the estate of the deceased may be settled without other litigation.

The judgment is reversed, and the trial court is directed to overrule each demurrer and to permit further proceedings in accordance with this opinion.